UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

   vs.                    REPORT AND RECOMMENDATION

Chad Michael May, and
Christan Darryl Veith,

       Defendants.          Crim. 06-08 (06-07)(RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendants Chad Michael May ("May"), and Christan Darryl Veith ("Veith"):

    1.     May's Motion to Suppress Statements.

    2.     Veith's Motion to Suppress Statements.

    3.     May's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

A Hearing on the Motions was conducted on May 1, 2006,[1] at which time, May appeared personally, and by William G. Selman III, Esq.; Veith appeared personally, and by Kevin M. O'Brien, Esq.; and the Government appeared by Tracy L. Perzel, Assistant United States Attorney.

For reasons which follow, we recommend that May's Motion to Suppress Statements be granted in part, and that the Defendants' other Motions be denied.

## II.  Factual Background

The Defendants are each charged with one Count of Conspiracy with intent to distribute, and to possess with intent to distribute, methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 846.  The events which give rise to the conspiracy charge are alleged to have taken place during the period beginning on or about, January 1, 2004, through at least on or about December 11, 2005.  All of the events are alleged to have occurred in this State and District.  As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions.  Leave was granted, and the last submission on the issues was received on May 22, 2006, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

summarized, as they were developed during the testimony of witnesses who were called by the Government, and memorialized in the Government's Exhibits offered, and received into evidence.

At the Hearing on the Defendants' Motions, the Government presented testimony from Michael Bestul ("Bestul"), who is a Sergeant with the Brainerd Police Department; Andrew Galles ("Galles"), who is an Investigator with the Crow Wing County Sheriff's Department, and who is assigned to the Lakes Area Drug Task Force ("LADTF"); Ann Marie Hunnicutt ("Hunnicutt"), who is an Officer with the Baxter Police Department; and Jeremy Leese ("Leese"), who is a Special Agent with the Minnesota Bureau of Criminal Apprehension, and who was an Officer with the Brainerd Police Department at the time of the activities in question.

A.    May's Arrest and Interviews on December 11, 2005.

Bestul testified that he participated in an ongoing investigation, which focused on drug-trafficking between Minnesota, Oregon, and Washington.  During the early morning hours of December 11, 2005, Bestul, and other law enforcement agents, arrested Adam Monnes ("Monnes"), who is a co-Defendant, upon his arrival at an Amtrak station, where he was found in possession of large quantities of methamphetamine.  Law enforcement also arrested Michelle Bohlke ("Bohlke'), who

is also a co-Defendant, and who was waiting at the station to meet Monnes.  As a result of those arrests, law enforcement placed Bohlke's residence under surveillance, and obtained a Search Warrant.

Galles and Hunnicutt testified that they obtained a Search Warrant for the Bohlke residence, and placed it under surveillance with other law enforcement officials.  During the course of the surveillance, they learned that Chad Chisholm ("Chisholm"), who is a co-Defendant, was at the Bohlke residence, and was armed with a weapon.  Approximately five (5) minutes after receiving the information about Chisholm, Hunnicutt observed a white van approaching the residence and learned from Russ Wicklund ("Wicklund"), who is a Baxter police officer, that the van pulled into the Bohlke residence's driveway, but that Wicklund was unable to observe the vehicle's license plate number.  During the time that the house was under surveillance, law enforcement officials did not observe any persons exiting the residence, and it was decided that a tactical team of law enforcement officials would enter the residence before the investigative team's entry.

The tactical team entered the Bohlke residence, and secured the occupants, who were later identified as May and Chisholm, in handcuffs.  Hunnicutt and Galles testified that May and Chisholm were detained incident to the execution of the Search

Warrant, in order to effectuate officer safety.  May was questioned about his arrival in the white van and his presence at the residence, at which time May confirmed that he was on probation.   Officers performed a weapons pat-down on May, and discovered a marijuana pipe on his person.  Hunnicutt testified that she knew May from previous interactions, including traffic stops, and was aware that May's driving privileges were revoked, and that he was on probation prior to the execution of the Warrant.  May stated that he had been driving the van without insurance.  Galles, who also testified that he was aware that May was on probation, as well as on conditional release in connection with charges in Crow Wing County, Minnesota, contacted May's probation officer, and explained that May had been driving without a valid license, and was also found with a marijuana pipe on his person.  The probation officer advised Galles to place May under arrest for violations of his supervised release, as well as for driving with a revoked license.   May was arrested and transported to the Brainerd Police Department.

Hunnicutt performed an inventory search of the white van prior to it being towed, which she testified was pursuant to the standard procedure of the Baxter Police Department.  She discovered a number of documents, which she believed were "drug notes," in plain view inside of the van.  The van was then towed to an Amoco station.

At 1:03 o'clock p.m., on that same date, May was interviewed by Bestul and Brian Marquart ("Marquart"), who is a Special Agent with the Minnesota Bureau of Criminal Apprehension, after May's arrival at the Brainerd Police Department. Bestul testified that no statements by May were made prior to the recording, and that May appeared sober, without any apparent mental or physical impairments, and responded appropriately to questioning. The recording begins with Marquart explaining to May that he was under arrest for a probation or release violation, and May asked what would happen "when we're done here." Bestul and Marquart explained that May would be going to the County Jail for the violation, and that he would likely see a Judge on the following day. Bestul and Marquart asked May for his name, address, phone numbers, and his occupation. May was then advised of his <u>Miranda</u> rights, and was asked if he understood those rights. May invoked his right to counsel, and the interview was immediately stopped at 1:06 o'clock p.m.

While waiting for the Jail staff to transport May to a cell, May told Bestul that he wanted to speak further. Bestul testified that he advised May that he could not question May further, as he had invoked his right to an attorney. May reiterated his desire to speak, so Marquart and Bestul began recording their interactions with May for a second time, twenty-one (21) minutes after the conclusion of the first interview.

- 6 -

As memorialized by the transcript of the recorded interview, Marquart began

by explaining that May had previously invoked his right to speak with an attorney.

The following exchange then occurred:

> Marquart:     After that conversation, um, you indicated that
> you wanted to speak with us, is that still true?
>
> May:          I believe so.
>
> Marquart:     Okay.  You believe so?  Or you know so?
>
> May:          Believe so.  I still don't know what you wanna
> talk about yet.

Government Ex. 3, at 1.

Marquart proceeded to explain that May's name had been brought up in the ongoing

drug trafficking investigation, and that several persons had "talked about things that

they've done and if you would be willing to talk with use, that's what we wanna talk

about." Id.  May noted that those persons were his friends, and Marquart explained

that "there are no friends today," and that people were being afforded an opportunity

"to decide which side of the street they wanna be on." Id. at 1-2.  Marquart proceeded

to advise May of his Miranda rights.  May confirmed that he understood those rights,

and Marquart asked him if "having these rights in mind, do you wanna talk to us

now?" at which point May said "sure." Id. at 2.

May proceeded to explain his involvement with the organization, and his involvement with methamphetamine.   May stated that he had "a disease" with methamphetamine, "just like everybody else in this town," and stated that he does not sell methamphetamine, but used it as "fuel" for himself  Id. at 3.   Bestul then told May:

> Here's the deal, Chad, okay here's the deal, this has been an extremely long investigation * * * we know what your involvement is, okay?  We do. Now if you wanna sit there and lie straight to Brian and my face, we're gonna get up and walk away * * * but I'll tell ya what.  Once we leave this room, I don't care about you, Chad.  I don't wanna know anything else.  All we want is the truth.  So you sit and lie to us, you've got a couple of minutes and we're done.  And you can face the consequences.

Id.

Marquart then explained the criminal liability of conspirators, and May stated, "I still don't understand how I could be guilty of doing something that I had nothing to do with."  Id. at 3-5.   May reiterated he had never sold methamphetamine, but had received it from others.  Upon further questioning from Marquart, May stated "I don't know, I don't wanna, I think I should have a lawyer," and that he did not want to lie to law enforcement.   Id. at 6.  Marquart confirmed that lying would make matters

worse, and terminated the interview ten (10) minutes after it had began.  May was booked on the probation violation after the interview.

At the Hearing, Bestul testified that May was not threatened or made any promises during either recorded interview.  He also stated that nothing in May's demeanor suggested that May lacked the physical or mental capacity to understand his rights, or that his will was overborne.

B.   Veith's Statements of December 11, 2005.

Veith had been considered a person of interest in the ongoing drug trafficking investigation.  After the arrests of Monnes, Bohlke, and May, law enforcement officials decided to interview Veith to discover if he had any information useful to the investigation.  On December 11, 2005, Hunnicutt, Galles, Pat Pickar ("Pickar"), and Leese, arrived at Veith's residence in two (2) unmarked police vehicles to see if Veith was amenable to travelling to the Brainerd Police Station for an interview.  The police officers did not call Veith prior to their arrival at his residence.

Upon arriving at Veith's home, one of the law enforcement officers knocked on the door.  After a brief delay, Veith answered the door.  At least one of the officers asked Veith if they could come inside his home, to which he replied "yes."  Veith had

been alone, and had been lying on the couch in his underwear with the television on. Veith stated that he had to go put some clothes on, at which point officers asked if they could look around the residence to see if anyone else was present in the home. Veith consented to a search of his home for others, and proceeded to smoke a cigarette on his own accord.  Veith told the law enforcement officers that he knew about what was going on at the train station.  The police then asked if Veith would be willing to go to the police department for an interview, to which he responded affirmatively.

Hunnicutt testified that Veith did not appear to be under the influence of drugs or alcohol, and that the officers would have left if Veith refused to accompany them to the police station.  She also testified that she had past dealings with Veith in her capacity as a police officer, and knew him from growing up in the area.  Before leaving Veith's residence, Veith smoked another cigarette and asked the law enforcement officials if he could drive himself to the station.  The police officers agreed, but Veith had apparently locked his keys inside the vehicle, and had no method of accessing his vehicle.  The police officers offered a ride to Veith, which he accepted.  The vehicle in which Veith traveled was an unmarked, uncaged undercover police Sport Utility Vehicle, with standard locks.  Two (2) officers rode with Veith to the Brainerd Police Station.

Upon arrival at the police station, Veith met with Marquart and Bestul in one of the station's two (2) interview rooms. The interview was conducted in the more secure room, as the other room was typically used for children and victims of crimes. Veith was interviewed for forty (40) minutes, and a recording was made of that interview. Bestul testified that he was familiar with Veith, as he had interacted with him while investigating a car accident.

At no point during the initial meeting at the residence, or during the interview at the police station, was Veith advised of his <u>Miranda</u> rights. All of the Government's witnesses testified that they believed the <u>Miranda</u> advisory was unnecessary, as Veith was not under arrest, or otherwise held in custody. During the interview, Marquart informed Veith that he was not under arrest, and recounted that Veith was going to drive himself to the station, but had locked his keys in the car. Marquart also informed Veith that he was free to leave at any time, and that "no matter how this ends * * * we're gonna take you back home." Veith confirmed he understood that he was free to go, and mentioned that his mother was on her way to pick him up.

Throughout the interview, Veith continued to deny his involvement with drug trafficking, and never requested the police to cease their questioning. Veith also

acknowledged that he had not received any threats or promises to acquire his cooperation. The door to the interview room was closed, but unlocked, and if Veith so desired, he could have walked out of the police station and into downtown Brainerd without encountering any locked doors. At the conclusion of the interview, Veith stated that his mother should have arrived, and the interview was terminated. Government Ex. 5, at 44. Veith was not arrested at the conclusion of the questioning, and left the police station on his own volition.

Bestul testified that Veith was not made any promises and was not told of any consequences which would result if he failed to cooperate. Nothing in Veith's demeanor suggested that he failed to understand the line of questioning. Bestul also stated that Veith was familiar with law enforcement as a result of the car accident. The entirety of Bestul's interactions with Veith were memorialized in the recording and the transcript.

    C.    <u>May's Interview on April 6, 2006</u>.

In April of 2006, a Superseding Indictment was issued that added May, as well as several other co-Defendants, as co-conspirators. A Bench Warrant was subsequently issued for May's arrest. Jeff Baker, who is an Agent with the Drug Enforcement Agency, took May into custody, and contacted Bestul. On April 6, 2006,

Bestul arrested May pursuant to several Federal and State Warrants.  At the time of the arrest, Bestul explained that law enforcement officials were conducting an on-going investigation into methamphetamine trafficking.  After advising him of his Miranda rights, Bestul asked May if he were willing to participate in an interview. Brainerd Police Department Supplemental Report, Government Ex. 6, at 2.  May agreed, and made several incriminating statements.

The interview -- which was not recorded -- lasted for one (1) hour and concluded when May asked to speak with his attorney.  Bestul testified that May seemed to understand the questions he was asked, and did not appear intoxicated based upon Bestul's experience and training.  Bestul also stated May was not lied to, promised anything, or threatened in any manner.  After the interview was terminated, Bestul advised May that he was being transported to the Crow Wing County Jail. Bestul no longer has the notes from this interview, but he completed a contemporaneous police report.

D.     <u>The Search Warrant for the Text Messages</u>.

Leese testified concerning the circumstances that surrounded the Search Warrant for all text messages sent, and received, by two (2) of May's telephone numbers over a discrete period of time.  Leese testified that he prepared the Search Warrant based upon information obtained from personal observation, as well as from Bestul and Marquart.  Bestul, as a result of information obtained from a cooperating co-Defendant, learned that text messages between the methamphetamine trafficking organization were sent to the cellular phone numbers which were the subject of the Search Warrant.  The text messages were used to communicate the delivery and ordering of methamphetamine.  Leese drafted an application for a Search Warrant, as well as a Supporting Affidavit, which he provided to State District Judge Zimmerman. Leese averred that a cooperating co-Defendant had a track record of reliability, and that law enforcement had been able to independently corroborate the information. <u>Government Ex. 7</u>, at 2.

Leese witnessed Judge Zimmerman review, correct the date, and sign the application.  Leese testified that he believed he possessed legal authorization to conduct the search.  The Warrant requested "all text messages received and sent" for the authorized phone numbers, "for the past 30 days from the receipt of this court

order." Id. at 1.  The Government represents that the mobile phone company, upon

which the Search Warrant was executed by facsimile, "gave law enforcement both

messages within the time frame specified by the search warrant and messages outside

that time frame."  Government's Response to Defendant's Motions to Suppress

Evidence, Docket No. 253, at 26.

### III.  Discussion

A.   The Defendants' Motions to Suppress Statements.

1.   Standard of Review.  Government agents are not required to

administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason,

429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official

interrogations where a person has been "'taken into custody or otherwise deprived of

his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318,

322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769

F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

Once a suspect is in police custody and subject to interrogation, the suspect must be

informed of his constitutional right to remain silent, and to be represented by legal

counsel during questioning.  See, Miranda v. Arizona, supra at 473; see also, Dormire

v. Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001).  "The right to counsel recognized in

<u>Miranda</u> is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994); see also, <u>United States v. Ortiz</u>, 315 F.3d 873, 885 (8th Cir. 2002).  Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the <u>Miranda</u> warnings, law enforcement officers are free to question him."  <u>Id.</u>, citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-376 (1979); see also, <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994).

In addition, for purposes of the <u>Miranda</u> inquiry, "[i]n determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Stansbury v. California</u>, supra at 322, quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).  A list of common indicia of custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether

> strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990); see United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied 544 U.S. 1060 (2005); United States v. Axsom, 289 F.3d 496, 500, 501 (8th Cir. 2002).

The Court has regarded the first three of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during questioning, of one or more of those factors would tend to weigh against a finding of custody.  On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody.  A "finding of custody does not, however, have to be supported by all six factors."  United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002), citing United States v. Griffin, supra at 1349; see also, United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996).

These factors, however, "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract."  United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827.  Instead, the Griffin factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest."  See, United States v. Czichray, supra at 827.

Whether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, <u>Dickerson v. United States,</u> 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States,</u> supra at 434, citing <u>Schneckloth v. Bustamonte,</u> 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

<u>Id.</u> at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams,</u> 507

U.S. 680, 693 (1993); any elements of "police coercion," see, <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v. Denno</u>, 347 U.S. 556, 561 (1954).   See also, <u>Withrow v. Williams</u>, supra at 693 (listing the applicable considerations).

   2. <u>May's Motions to Suppress Statements</u>.   May gave four (4) statements to police:  (1) on December 11, 2005, when he was handcuffed during the execution of the Search Warrant; (2) on December 11, 2005, during his initial interview with Marquart and Bestul; (3) on December 11, 2005, after May had invoked his right to counsel; and (4) on April 6, 2006, while the Defendant was arrested on Federal and State charges.   The Defendant acknowledges that the second set of statements, during his initial interview with Marquart and Bestul, should not be suppressed.   Accordingly, as each remaining set of statements implicates different issues, we address each statement that May contends should be suppressed in turn.

   a. <u>The Interview on December 11,</u>
     <u>2005, at the Bohlke Residence</u>.

   May contends that the statements he made while he was detained at the Bohlke residence should be suppressed, as they were made in response

to custodial interrogation, without the benefit of a <u>Miranda</u> advisory.  Accordingly, our analysis turns on whether May was in custody at the time of his statement.

Here, May's statement -- namely, that he was on probation, and that he had just arrived in the van before law enforcement entered the residence -- made while handcuffed, pursuant to the search of the Bohlke residence, should be suppressed. The testifying officers never reported telling May that he was not required to respond to their line of questioning, or that he was free to leave.  It is unquestioned that law enforcement also initiated the contact with May by executing the Search Warrant at the Bohlke residence.  Accordingly, at least two of the mitigating factors counsel in favor of suppressing those statements.

As to the "coercive" factors, we find that, in combination, the factors are neutral as to the suppression of the statements.  May was placed under arrest in the aftermath of his detention, which factors towards a finding of custody.  However, there was no indication of any stratagems, or strong arm tactics, employed by law enforcement, nor does May's questioning at the home of an acquaintance by one (1) or two (2) interviewing officers render the atmosphere of the detention as police dominated.  See, <u>United States v. Wallace</u>, 323 F.3d 1109, 1113 (8th Cir. 2003)(noting that, in the context of the execution of a search warrant, the relevant inquiry is if the questioning,

not the execution of the search warrant, is police dominated); United States v. Axsom,

supra at 502 (finding questioning by two (2) out of nine (9) officers present during the

execution of a search warrant did not establish that interview was police dominated

).

However, the most problematic factor in this detention is the continued restraint

on May's freedom through the use of handcuffs over the course of his statements.  We

recognize the Government's argument that the detention in handcuffs was necessary

for the safety reasons, and was permissive, in the context of Michigan v. Summers,

452 U.S. 692 (1981), where it was held that, for Fourth Amendment purposes, the

inhabitants of a residence may be restrained during the execution of a Search Warrant.

See also, Muehler v. Mena, 544 U.S. 93, 102 (2005)(finding no Fourth Amendment

violation during questioning of defendant detained in handcuffs).  However, our

analysis, under Miranda, invokes different concerns than those relevant for purposes

of a Fourth Amendment analysis, and instead asks "whether the defendant was

restrained as though he were under formal arrest." See  Stansbury v. California, supra

at 322, quoting California v. Beheler, supra at 1125; United States v. Czichray, supra

at 830; see also, United States v. Newton, 369 F.3d 659, 676-78 (2nd Cir. 2004), cert.

denied 543 U.S. 947 (2004)(finding the holding of <u>Michigan v. Summers</u> inapposite to the analysis of custody for <u>Miranda</u> purposes).

Here, we note that handcuffs are a hallmark of a formal arrest. See, <u>New York v. Quarles</u>, 467 U.S. 649, 655 (1984)(finding, that for <u>Miranda</u> purposes, a defendant was in custody when handcuffed and surrounded by police officers); <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 18 (1st Cir. 1998); <u>United States v. Grey Water</u>, 395 F. Supp. 2d 850, 854 (D.N.D. 2005), reconsideration denied, 2005 WL 548377 (D.N.D. March 3, 2005). Here, Galles and Hunnicutt testified that May was handcuffed throughout his questioning, and that May was not free to leave throughout his detention. In light of the fact that he was handcuffed and had his physical movement restrained by law enforcement, we find that May was severely restricted in his freedom of movement throughout the detention, and that this factor weighs heavily in favor of finding custody for <u>Miranda</u> purposes. See, <u>United States v. Newton</u>, supra at 677; <u>United States v. Grey Water</u>, supra at 850.

After taking into account all of the required factors, we find that all of the "mitigating" factors, as well as at least one of the "coercive" factors weigh in favor of suppression. Accordingly, given the severe restriction placed on May's freedom of movement throughout the course of his detention, we recommend that May's

statements, which were made without the benefit of a <u>Miranda</u> warning while he was handcuffed, and detained pursuant to the execution of a Search Warrant, should be suppressed.

> b.  <u>The Interview on December 11, 2005, at the Brainerd Police Department</u>.

May also seeks to suppress those statements he made at the police station on December 11, 2005, after he had invoked his <u>Miranda</u> rights, and had requested an opportunity to consult with an attorney, and argues that the police officers recommenced questioning without May's attorney being present.  See, <u>United State v. Valdez</u>, 146 F.3d 547, 551 (8th Cir. 1998)("Once an accused requests counsel, no further interrogation may take place until counsel has been made available or 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'"), quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

As the transcript of the interview reveals, Marquart acknowledged May's request for an attorney, and terminated the interview.  See, <u>Government's Ex. 2</u>, at p. 3.  May, however, then expressed his desire to continue talking with Marquart and Bestul, while waiting transport to his Jail cell, some twenty-one (21) minutes after he

had invoked his right to counsel.  When Marquart again referenced May's right to counsel, May reiterated his desire to make a statement.  As the transcript reveals, May was expressly asked if he wanted to initiate further discussion, to which he initially stated "I believe so."  <u>Government Ex. 3</u>, at p. 1.  After clarification, Marquart provided May a fresh <u>Miranda</u> advisory, and May responded that he understood those rights, which he had previously invoked, and that he waived them.

While May had initially requested an attorney in unequivocal tones, and while Marquart stopped asking May questions related to their investigation, and refrained from doing or saying anything that was reasonably likely to elicit an incriminating response from May,[2] May voluntarily initiated a further dialogue with Bestul and Marquart, after he had previously invoked his right to counsel.  See, <u>Owens v. Bowersox</u>, 290 F.3d 960, 963 (8th Cir. 2002)("A defendant 'initiates' an interrogation if he or she "'evinces a willingness and a desire for a generalized discussion about the investigation,'"" quoting, <u>Holman v. Kemna</u>, 212 F.3d 413, 417 (8th Cir. 2000), cert.

---

[2]Accordingly, we also find that Marquart ceased any "interrogation" of the May, after May invoked his right to counsel.  See, <u>Holman v. Kemna</u>, 212 F.3d 413, 418 (8th Cir. 2000)("Interrogation refers not only to express questioning but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect."), citing, <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).

denied, 531 U.S. 1021 (2000), quoting, in turn, <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045-46 (1983)).

As our Court of Appeals has explained, "[t]he purpose behind the prophylactic rule announced in <u>Edwards</u> is to prevent police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights." <u>Holman v. Kemna</u>, supra at 417.  As the transcript of the taped interview illustrates, far from law enforcement officers badgering May, May voluntarily asked them about making further statements, after Marquart had stated that he was not going to ask May any further questions.  The fact that Marquart and Bestul engaged May in dialogue, by responding to the Defendant's questions, and by recommencing the interview does not constitute a violation of the rule announced in <u>Edwards</u>.  See, <u>United States v. Hull</u>, 419 F.3d 762, 768 (8th Cir. 2005), cert. denied, --- U.S. ---, --- S. Ct. ---, 2006 WL 993501 (May 15, 2006) (observing that no <u>Miranda</u> violation occurred when a defendant initiated contact with police minutes after invoking the right to counsel on a matter relating to the police investigation); <u>United States v. Valdez</u>, supra at 551 (finding a defendant's confession was made knowingly and voluntarily after the defendant initiated further communication and waived his <u>Miranda</u> rights moments after previously invoking and subsequently being re-advised of them).  Accordingly, with respect to the statements

made to police, on December 11, 2005, at the police station, we recommend that May's Motion to Suppress be denied.

           c.     The April 6, 2006 Interview at
                   the Brainerd Police Department.

       May contends that the statement he made to police on April 6, 2006, should also be suppressed, as he had invoked his right to counsel nearly four (4) months earlier. He argues that "[r]eading [May] his Miranda rights for the third time cannot overcome his prior invocation of his right to counsel." May's Memorandum in Support of Motions, Docket No. 250, at p. 9. Bestul testified that he arrested May, and advised him of his Miranda rights, which May acknowledged and waived.

Pursuant to Edwards, in the context of the Fifth Amendment, "[a] suspect who invokes the Miranda right to counsel may not be reapproached by police unless counsel is made available." United States v. Harris, 221 F.3d 1048, 1051 (8th Cir. 2000). However, "[t]he Supreme Court has suggested, in dictum, that a break in custody defeats Edwards protection." Id., citing McNeil v. Wisconsin, 501 U.S. 171, 177 (1991)("If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary * * *."). Our Court of Appeals noted that at least six Courts of

Appeal had adopted a consistent rule, which "expressly limit[ed] Edwards protection to those suspects who remain in continuous custody from the time they request counsel to the time they are interrogated again." Id. at 1052 (citing cases) [emphasis in original]; see also, United States v. Arrington, 215 F.3d 855, 856-57 (8th Cir. 2000). Further, the Court recognized that, in Holman v. Kemna, supra at 419, it had "effectively agreed to go beyond [United States v.] Skinner [667 F.2d 1306, 1309 (9th Cir. 1982)], finding that Edwards protection might be unavailable even to some suspects who had remained in continuous custody." Id. at 1052. See

We find that Edwards is inapplicable to the circumstances presented here. May was not in "continuous custody" between his invocation of his right to counsel on December 11, 2005, and April 6, 2006, and that he had ample opportunity to consult with counsel prior to the interview on April 6, 2006, and therefore, the protections of Edwards do not apply. See, United States v. Harris, supra at 1053 (noting a three-hour break in custody is sufficient to defeat the protections of Edwards).

We must also determine, however, consistent with the requisites of the Fifth Amendment, whether the statements given by May were voluntary, or whether they were the product of an overborne will, and we proceed to that inquiry.

Notably, May fails to sustain an assertion, that any of his statements were involuntary, with any specific, and evidence-based, demonstrations of coercion.  As we have detailed, May's interview was the product of his election to cooperate with law enforcement after his arrest.  May does not contend that the length of the interrogation was unduly burdensome, that he was denied any of the normal accommodations of daily living, or that the agents duped him into lending his cooperation to their investigation.  He does not suggest, let alone support, the existence of any physical, or mental impairments, which would impact upon the voluntariness analysis, nor urge any age-related naivety which would reflect a less than voluntary choice, on his part, to answer law enforcement's questions.

Accordingly, we find that the May's will was not over-borne and, under the totality of the circumstances, we conclude that the May's statements, which were made during the interview on April 5, 2006, were voluntary, and therefore, May's Motion to Suppress those statements should be denied.

3.     <u>Veith's Motion to Suppress Statements</u>. Veith asserts that his initial interaction with police, on the morning of December 11, 2005, along with the environment of the questioning, rendered Veith "in custody" from the outset of the entry of police officers into his residence.  Our analysis of Veith's custodial status for

- 28 -

Miranda purposes is guided by those same Griffin factors that we have previously considered in May's Motion to Suppress Statements.

In addition, we are guided by our Court of Appeals' analysis in United States v. LeBrun, 363 F.3d 715, 718 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005), where two law enforcement officers approached the defendant at his place of employment, told him that they were conducting an investigation, and asked him to come down to the police station for an interview. Although the officers did not advise the defendant of the nature of the investigation, the defendant agreed to the interview and, pursuant to the officers' suggestion, rode to the station house in the front seat of an unmarked patrol car. Upon their arrival, one of the officers advised the defendant that he was not under arrest, that he was free to terminate the impending interview at any time, and that he was free to leave at any time. The officers then took the defendant to a windowless interview room, which had enlarged photographs of scenes from the defendant's life on its walls. During the interview, the officers used a number of psychological ploys, which were designed to secure a confession, such as telling him that he was the prime suspect in a murder investigation, that the officers had significant evidence showing him to be the perpetrator of the murder, and that a trial of the matter would cause him financial hardship, and ruin his family's

reputation.   The defendant, who had not been advised of his <u>Miranda</u> rights, subsequently confessed to the murder.  Following a telephone call to his wife, the officers brought the defendant to his house.  The defendant was not arrested at that time.

Applying the totality of the circumstances, the Court found that the defendant was not "in custody" during the interview.  In so finding, the Court 'discounted' the fact that the interview took place in a station house, "in a small windowless room; that the authorities admittedly used deceptive interview tactics; that the interview was designed to produce incriminating responses as evidenced by the large photographs on the wall; and that the agents falsely trumped up the evidence that they said they possessed," <u>id.</u> at 721, reasoning as follows:

> [Oregon v.] Mathiason and [California v.] Beheler teach us that some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.
>
> *     *     *
>
> Whatever coercion existed in this case was not of the sort that a reasonable person would perceive as restricting his freedom to depart.  Indeed, the facts support the opposite conclusion.   [The defendant] was never physically

> restrained. He was never placed in handcuffs.  The agents
> told [the defendant] before the interview commenced that
> he was free to leave.  [The defendant] testified that he
> understood that he was free to terminate the interview and
> leave at any time.  [The defendant] had his cellular phone
> with him during the interview, and he called his wife from
> the interview room.

Id. at 721-22.

Similarly, in United States v. Black Bear, 422 F.3d 658 (8th Cir. 2005), the Court

applied the Griffin factors, and found that the defendant was not in custody, under the

following circumstances:

> 1.    [The defendant] was informed at the time of his
> interview that he was not under arrest, would not be
> arrested at the end of the interview, did not have to speak
> with [the interviewing officer], and could end the interview
> at any time;
>
> 2.    While [the defendant] did not have unrestrained
> freedom of movement during the interview because it
> occurred in a closed-door room in the police department, he
> nonetheless accompanied [the interviewing officer] to the
> room and was not handcuffed or restrained at any time
> during the interview;
>
> 3.    [The defendant] voluntarily acquiesced to [the
> interviewing officer's] requests to respond to questions;
>
> 4.    No strong-arm tactics or deceptive strategies were
> employed during his interview;
>
> 5.    While the atmosphere was police-dominated to some
> extent, it was not overly so to the point that [the

defendant's] freedom of movement was restrained to the
degree associated with formal arrest; and

6.     He was not placed under arrest at the termination of
the interview.

Id. at 662-63, citing United States v. Axsom, supra at 500.

Given the circumstances which surrounded the questioning in LeBrun and Black Bear,

we are persuaded that Veith was not in custody at any time during his interview on

December 11, 2005.

In so finding, we note that the balance of the Griffin factors weighs against

custody.  Specifically, while four (4) police officers arrived at Veith's residence, the

actual interview took place at the police department, and was conducted by only two

Agents.  See United States v. Axsom, supra at 502 (interview was not custodial

despite the presence of nine Agents, where only two Agents participated in the

interview, the evidence reflected a "more casual scene," and the interview was

conducted in the defendant's home).  In addition, the fact that an interview was

conducted at a police station does not transform the interview into a custodial

situation. See, United States v. LeBrun, supra at 722; United States v. Galceran, supra

at 931("the interview's setting was not police dominated, even though the interview

took place at a police station.").  Also, at the outset of the interview, Veith was

advised that he did not have to answer their questions, that he was not under arrest;

that he was free to end the interview at any time; and that he would not be placed under arrest at the end of the interview.  Moreover, upon the officers' arrival at his residence, Veith was never informed that he was required to submit to questioning at the police station, although law enforcement did advise that, if he were willing to cooperate, he had to come to the police station to provide the interview.

The absence of the usual attributes of custody also weighs against Veith's characterization that he was subjected to custodial questioning.  Specifically, Veith was told he could drive himself to, and from, the interview in his own personal vehicle.  Ultimately, Veith was transported in an unmarked police vehicle, but only as a police courtesy, after discovering that his keys were locked inside his own vehicle. Veith was never placed in handcuffs, or otherwise had his freedom of movement restricted in any way.  He was told that police would transport him back after the interview, or that he could "walk out at any time."  Veith responded that his mother would come to the station and bring him back home, an event which terminated the interview.

We specifically find that, at no time, did Marquart or Bestul threaten or deliberately deceive Veith, or engage in questioning that was designed to intimidate him or overbear his will.  We credit Marquart's testimony, that neither Agent

threatened or lied to Veith, and that neither raised a voice during the entirety of the questioning.

It is also abundantly clear, on this Record, that Veith voluntarily agreed to travel to the police station and answer the Agents' inquiries. Specifically, when law enforcement arrived to transport Veith from his home to the police station, Hunnicutt told him that the Agents wanted to talk to him, and thereafter, Veith agreed to proceed to the site of the interview. Veith went about getting dressed and smoked his cigarettes before embarking to the interview. Thereafter, upon Veith's arrival at the police station, Marquart asked him whether he was willing to answer questions, and Veith responded affirmatively.

Moreover, despite Veith's arguments to the contrary, we further find that the atmosphere of the interview, and his transport to the police station, were not so dominated by police as to render Veith "in custody." While a total of four (4) Agents were initially present at Veith's residence, the testimony of the officers establishes that Veith was not coerced or deceived into traveling to the police station, for his decision was voluntary, and he was willing to drive himself. Similarly, there is no showing that Veith, himself, was compelled to go to the police station. According to Hunnicutt's testimony, she told Veith that the Agents wanted to talk to him about the

events at the Amtrak station earlier that morning, and that Veith invited them in to his home and agreed to talk, and that he was willing to travel to the police station. The fact that Veith was transported to the interview in an unmarked police vehicle, with two (2) police officers in the vehicle, does not weigh towards a finding of custody. See, United States v. LeBrun, supra at 718, 723 (finding no custody for Miranda purposes, when defendant rode in front of unmarked patrol car to an interview at a police station). There has been no suggestion that any of the law enforcement officers engaged in any show of authority, which could responsibly leave an impression that Veith was not free to decline an interview.

While the interview room may have been the one often used for custodial interrogation purposes, such a factor does not weigh heavily in favor of custody, United States v. LeBrun, supra at 718, 721 (discounting the presence of photographs on the walls of the interview room), but is, nevertheless, a consideration that we have assessed. We are mindful that the interviewing agent may have been armed, but there is no suggestion that any weapons were brandished, or were otherwise the focal point of any commentary or objection. Accordingly, we find that the atmosphere of the questioning does not significantly weigh in favor of custody. Furthermore, Veith was not taken into custody following the morning interview, but he left the police station,

with his mother, of his own volition.  See <u>United States v. Galceran</u>, supra at 931 (describing the lack of an arrest as "a very important factor weighing against custody.").

In sum, we find and conclude, on this Record, that Veith could not have reasonably concluded that he was under formal arrest at the time of his interview on December 11, 2005, and, based upon an objective analysis of the <u>Griffin</u> factors, Veith was not in custody during the course of the interview.

Moreover, based mainly upon the same factors, as particularly augmented by Veith's age and experience with the criminal process, we also find that the statements made by Veith, during the interview, were voluntarily given.  Specifically, the Record reflects that Veith was advised that he was free to leave at any time, Veith was not handcuffed, or otherwise had his freedom of movement restricted, and there has been no showing that the Agents engaged in any coercive conduct during the interview. The Agents did not raise their voices, or threaten Veith.  We have no reason to believe, and the Record suggests none, that, had Veith requested the interview to stop, or if he had refused to participate, he would suffer any consequences from that choice.

Accordingly, we find that the interviewing Agents did not engage in any coercive conduct, much less conduct sufficient to have overborne Veith's will, given

the length of the interview.  See, e.g., <u>United States v. Goudreau</u>, 854 F.2d 1097, 1098 (8th Cir. 1988)(two and one-half hour interview was not "excessively lengthy."); <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993)(interviews which extended for six or seven hours, without a full <u>Miranda</u> advisory, did not prompt an involuntary confession, citing cases), cert. denied, 510 U.S. 822 (1993).  In point of fact, the interview was only as long as Veith allowed, as the interview was terminated when he expressed a desire to leave when his mother arrived at the station.  Accordingly, since we find that Veith's will was not overborne by the conduct of the Agents, we also find that Veith's statements during the interview were voluntary.  See <u>United States v. Galceran</u>, supra at 931("[C]oercive police activity is a "necessary predicate" to a finding that a confession was not voluntary within the meaning of the Due Process clause."), citing <u>Colorado v. Connelly</u>, supra at 165-167; <u>United States v. Kime</u>, 99 F.3d 870, 880 (8th Cir. 1996), cert. denied 519 U.S. 1141 (1997)("A confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials."), citing <u>Russell v. Jones</u>, 886 F.2d 149, 151 (8th Cir. 1989).  Finding no basis to suppress any of his statements, we recommend that Veith's Motion should be denied.

      B.    <u>May's Motion to Suppress Evidence Obtained from Search and Seizure</u>.

May also seeks to suppress the evidence obtained from the inventory search of the white van, which had arrived at the Bohlke residence, as well as the evidence seized pursuant to a Search Warrant, which authorized the seizure of all text messages on two (2) identified phone numbers over a specified time period. As each search implicates different concerns, we address each separately.

1.   The December 11, 2005 Warrantless Inventory Search of the Van.

a.   Standard of Review. Inventory searches of vehicles which have been impounded pursuant to standard police procedure do not require a Search Warrant. See United States v. Betterton, 417 F.3d 826, 830 (8th Cir. 2005)("To be constitutional, '[a] warrantless inventory search must be done pursuant to "standard police procedures" and for the purpose of "protecting the car and its contents."'"), quoting United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998). As the Supreme Court explained, in South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976), "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions," Cady v. Dombrowski, [413 U.S. 433, 441 (1973)], automobiles are frequently taken into police custody" and, when they are, the police "generally follow a routine practice of securing and inventorying the automobiles' contents." These inventorying policies were developed to protect "the owner's property while

- 38 -

it remains in police custody," to protect "the police against claims or disputes over lost or stolen property," and to protect "the police from potential danger." Id. at 369; see also, United States v. Mayfield, 161 F.3d 1143 (8th Cir. 1998), cert. denied, 526 U.S. 1045 (1999).

The Supreme Court has determined "that inventories pursuant to standard police procedures are reasonable" under the Fourth Amendment. South Dakota v. Opperman, supra at 372; see also, Colorado v. Bertine, 479 U.S. 367, 374 (1987), United States v. Mayfield, supra at 1145, United States v. Hartje, 251 F.3d 771, 775-76 (8th Cir. 2001), cert. denied, 534 U.S. 1116 (2002); see also, United States v. Wallace, 102 F.3d 346, 348 (8th Cir. 1996)("In other words, '[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search.'"), quoting United States v. Marshall, 986 F.2d 1171, 1175-76 (8th Cir. 1993); see also, United States v. Betterton, supra at 830 ("[T]he district court did not err in concluding that the decision to impound was based on the legitimate concern of traffic safety and was 'not merely "a ruse for general rummaging in order to discovery incriminating evidence."'"), quoting United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004); United States v. Davis,

882 F.2d 1334, 1338 (8th Cir. 1989), cert. denied, 494 U.S. 1027 (1990)("To pass constitutional muster, the search also must be conducted pursuant to standard police procedures.").

       b.    <u>Legal Analysis</u>. May contends that law enforcement failed to follow standard procedure for an inventory search, and that the search was strictly in furtherance of their ongoing drug investigation. <u>May's Memorandum in Support of Motions</u>, <u>Docket No. 250</u>, at pp. 4-5. The Government, in turn, responds that May lacks standing to challenge the search of the van, and that, alternatively, the police properly performed an inventory search of the van. <u>Government's Response to May's Motions to Suppress Evidence</u>, <u>Docket No.253</u>, at pp. 16-21.

At the outset, even though May concedes in his briefing that he did not own the van that was the subject of the inventory search, we note that May has "standing"[3] to challenge the lawfulness of the search of the vehicle, and the seizure of items

---

    [3]"We use the term 'standing' as a shorthand reference to the issue of whether [the defendant's] Fourth Amendment interests were implicated by the challenged government actions," as "'[t]echnically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence * * * since the Supreme Court in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law.'" <u>United States v. Green</u>, 275 F.3d 694, 698 n. 3 (8th Cir. 2002), quoting <u>United States v. Sanchez</u>, 943 F.2d 110, 113 n. 1 (1st Cir. 1991).

therefrom.  See, United States v. Ameling, 328 F.3d 443, 446 n. 3 (8th Cir. 2003) ("Even though [the defendant] did not own the vehicle, as a passenger [he] may still 'challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'"), quoting United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

However, we conclude that the underlying circumstances, which led to the inventory search of the van, weigh against suppression of any recovered evidence. Both Hunnicutt and Galles testified that they were aware that May's driving privileges were revoked, and that May was on probation for past offenses -- prior to the surveillance of the Bohlke residence.  Furthermore, Galles stated that he was also aware that May was subject to conditions of release in Crow Wing County, and that he knew that law-abiding provisions are generally included in the conditions for probation, or on conditional release.

"Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Taylor, 106 F.3d 801, 803 (8th Cir.

1997), quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964); see also, <u>Kiser v. Huron</u>, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting <u>Olinger v. Larson</u>, 134 F.3d 1362, 1366 (8th Cir. 1998); <u>Tokar v. Bowersox</u>, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'" <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v. Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983).  We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  <u>Id.</u>

Here, it was logical for Galles and Hunnicutt to infer that May was the driver of the white van which was observed by law enforcement traveling to the Bohlke residence.  Just prior to the van's appearance, law enforcement were informed that Chisholm was present at the Bohlke residence with a firearm.  Accordingly, when two (2) persons were discovered at the house, which had been under constant surveillance, and one of those persons was Chisholm, it was reasonable for law enforcement to conclude that May was the driver of the van observed pulling into the driveway.[4] Furthermore, both Galles and Hunnicutt testified that, independent of any statements made by May, they would have concluded that May was the driver of the vehicle. Given that both Galles and Hunnicutt were aware of the status of May's license, they had probable cause to believe that he had been illegally driving the van, and had probable cause to arrest him, for committing an offense -- that is, driving with a revoked license in violation of Minnesota Statutes Section 171.24, Subdivision 2 -- in their presence, see Minnesota Statutes Section 629.34(a), and (c)(1).

Furthermore, during May's detention pursuant to the execution of the Search Warrant, contraband was found on his person, which included a marijuana pipe with

---

[4]We note that May, in fact, admitted to being the driver of the van.  However, given that we previously recommended that his statement be suppressed, we do not include that fact in our analysis.

residue.  Upon contacting the Crow Wing Probation Officer, and informing her of the discovery of a marijuana pipe on May's person, as well as May's act of driving with a revoked license, Galles was advised that those activities were in violation of the conditions of his probation, and/or his conditional release, and that May should be arrested.  Accordingly, based upon a totality of the circumstances, we find that Galles and Hunnicutt had probable cause to arrest May.  Accordingly, his underlying arrest was proper for purposes of the inventory search.

May maintains that the police failed to follow standard police procedures, in conducting the inventory search, and he contends that such a failure constitutes evidence that the search was a mere pretext, or "a ruse for general rummaging in order to discover incriminating evidence."  Florida v. Wells, 495 U.S. 1, 4 (1990); see also, United States v. Loaiza-Marin, 832 F.2d 867, 869 (8th Cir. 1987).   Courts have concluded that, compliance with the standard police procedures "tends to ensure the intrusion is limited to carrying out the government's caretaking function," but at the same time, they have cautioned reviewing Courts that "[t]his does not mean that inventory searches are always unreasonable when standard procedures are not followed." United States v. Mayfield, supra at 1145; see also, Whren v. United States, 517 U.S. 806, 816 (1996)("[I]t is a long leap from the proposition that following

regular procedures is some evidence of lack of pretext to the proposition that failure

to follow regular procedures proves (or is an operational substitute for) pretext.");

United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987).

Further, in considering the reasonableness of an inventory search, the subjective

intent of the executing officer does not invalidate an otherwise valid inventory search.

United States v. Garner, 181 F.3d 998, 991 (8th Cir. 1999); see also United States v.

Lewis, 3 F.3d 252, 254 (8th Cir. 1993), United States v. Marshall, 986 F.2d 1171, 1176

(8th Cir. 1993).   Thus, even if, at the time that they conducted an otherwise valid

inventory search, the officers suspected that they might find evidence of criminal

activity, the search would not be unreasonable.   See, United States v. Garner, supra

at 992.   In determining the reasonableness of an inventory search, Courts are to

consider the totality of the circumstances.   See, United States v. Mayfield, supra at

1145.

May contends that the "policy," which Hunnicutt followed, was not submitted

by the Government, and therefore, the Government has failed to meet its burden of

establishing the reasonableness of the inventory search.   See, United States v.

Marshall, supra at 1173, citing Mincey v. Arizona, 437 U.S. 385, 390 (1978). Here,

Hunnicutt testified that the Baxter Police Department has a standard policy regarding

inventory searches, that the policy is in writing, and that the search of the van was conducted in accordance with that policy.

This is not a case where the officers "did not mention any standard procedures whatsoever," or were "unable to state even when inventory searches are to be conducted," see United States v. Marshall, supra at 1175, nor is this a case where the officers did not adhere to the inventory search policy.  See, United States v. Rowland, 341 F.3d 774, 782 (8th Cir. 2003).  We find that the officers properly conducted an inventory search of the vehicle, in accordance with a standardized policy to tow the vehicle, pursuant to the May's arrest, and in the absence of a properly licensed driver. See, United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004)(rejecting the defendant's argument that the inventory search was invalid in the absence of a standardized impoundment policy, where the Court found, based on the officer's testimony, that it was "standard police policy to tow a vehicle when there is no one available to drive it"); see also, United States v. Hartje, supra at 776; United States v. Lowe, 9 F.3d 43 (8th Cir. 1993).  Furthermore, the towing of the vehicle was permissible.  See, Minnesota Statutes Section 169.041, Subdivision 4(12)(permitting police to impound a vehicle for safekeeping when "the driver * * * of the vehicle is taken into custody."); United States v. Hood, 183 F.3d 744, 746 (8th Cir. 1999), cert.

denied 531 U.S. 943 (2000); United States v. Mays, 982 F.2d 319, 322 (8th Cir. 1993)

("It was entirely reasonable for the officers to initiate an inventory search of the

vehicle at the arrest site.").

Accordingly, we recommend that the May's Motion to Suppress evidence

located during the inventory search of the van be denied.

> 2.   May's Motion to Suppress Evidence Obtained Pursuant to a
> Search Warrant.

a.   Standard of Review.   In the issuance of a Search Warrant,

the Fourth Amendment dictates that an impartial, neutral, and detached Judicial

Officer, will assess the underlying factual circumstances so as to ascertain whether

probable cause exists to conduct a search, or to seize incriminating evidence, the

instrumentalities or fruits of a crime, or contraband.   Warden v. Hayden, 387 U.S. 294

(1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516

U.S. 1139 (1996).   In order to find probable cause, it must be demonstrated that, in

light of all the circumstances set forth in the supporting Affidavit, there is a fair

probability that contraband, or evidence of a crime, will be found in a particular,

designated place.   United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United

States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).   For these purposes, probable

cause is "a fluid concept, turning on the assessment of probabilities in particular

factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002). Moreover, the reviewing Court must not engage in a de novo review, but rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. Illinois v. Gates, supra at 236.

b.    <u>Legal Analysis</u>.    Here, May contends that the supporting Affidavit, upon which the Search Warrant was premised, which was offered by Leese, was based entirely upon information obtained by other investigating officers, which was ostensibly obtained from interviews with a cooperating co-Defendant.  He further argues that Leese lacked personal knowledge of the reliability or veracity of the cooperating Defendant to support the Affidavit.

It is well settled that law enforcement officers can rely upon information provided by other law enforcement officers, so long as the reliance is reasonable.  See, <u>Doran v. Eckold</u>, 409 F.3d 958, 965 (8th Cir. 2005), citing <u>United States v. Hensley</u>, 469 U.S. 221, 232 (1985); see also, <u>United States v. Wells</u>, 347 F.3d 280, 287 (8th Cir. 2003), quoting <u>United States v. Horne</u>, 4 F.3d 579, 585 (8th Cir. 1993) ("[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication.").  Accordingly, the fact that much of the information that Leese relied upon was provided by other law enforcement officers, as opposed to his own personal observation, does not invalidate the Search Warrant.

We also recognize that much of the information, which is contained in the Affidavit, was supplied by a cooperating co-Defendant. When probable cause for Search Warrant is based on information provided by an informant, "'a key issue is whether that information is reliable.'" United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause."). As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'" Id., citing United States v. Anderson, 933 F.2d 612, 615 (8th Cir. 1991).

Consequently, the "core question" is whether the information provided by the informant was reliable.  See, <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.").   In turn, an informant is deemed reliable when his statements are corroborated by independent evidence.  See, <u>United States v. Warford</u>, 439 F.3d 836, 841 (8th Cir. 2006)("Even where an informant does not have a track record of supplying reliable evidence, the information may be considered reliable if it is corroborated by independent evidence."), citing <u>United States v. Williams</u>, supra at 593, and <u>United States v. Robertson</u>, 39 F.3d 891, 893 (8th Cir. 1994); <u>United States v. Carpenter</u>, 341 F.3d 666, 669 (8th Cir. 2003)("[C]orroboration of minor, innocent details may support finding of probable cause."), citing <u>United States v. Tyler</u>, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, <u>United States v. Koons</u>, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting <u>United States v. Fulgham</u>, supra at 401.

Here, we find that Leese reasonably relied upon the information provided by law enforcement officials, which was obtained from a cooperating Defendant, because the information was given against the cooperating defendant's own penal interest, see, United States v. Leppert, 408 F.3d 1039, 1042 (8th Cir. 2005)("[A]n informant's statement against his or her own penal interests (even if others are also implicated) is presumptively credible * * *."), and because at least some of his information had been confirmed, independently, by the further investigative efforts of the police. Specifically, Leese averred that he learned that Bestul "located a text message on the cooperating defendant's cellular phone confirming communications regarding the methamphetamine organization," and that "code words with accompanying phone numbers assigned to them had been entered into the cooperating defendant's cellular phone." Government Ex. 7, at p. 2.   Therefore, we find that the information provided by the cooperating Defendant was reliable, and was corroborated, and the Search Warrant that issued was supported by more than sufficient probable cause to believe that evidence of drug trafficking could be found by obtaining the text messages sent and received by the two specified phone numbers.[5]

_____

[5]Even if the information in the Search Warrants were insufficient to establish probable cause, we would be compelled, by the law of this Circuit, to find that the (continued...)

May also argues that the Court should suppress those text messages that were recovered beyond the time period specifically noted on the face of the Search Warrant. Notably, May fails to cite any authority which would require suppression of the text messages, which were furnished by the cellular provider outside the time frame requested in the time frame. The Government represents that the cellular provider included text messages for time periods beyond the scope of the Search Warrant. However, the provision of the text messages did not result from any government action, and accordingly, should not be suppressed.

"A search by a private citizen is not subject to the strictures of the Fourth Amendment unless that private citizen is acting as a government agent." United States v. Smith, 383 F.3d 700, 705 (8th Cir. 2004) , cert. denied, --- U.S. ---, 126 S. Ct. 1567 (2006), citing United States v. Malbrough, 922 F.2d 458, 461-62 (8th Cir. 1990), cert. denied, 501 U.S. 1258 (1991). Among the factors which determine whether a private entity is acting as an agent for the Government include: "whether the government had

---

[5](...continued)
officers' reliance upon those Search Warrants was reasonable, because the Warrants were "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984). Accordingly, even if probable cause were lacking, we would still recommend that May's Motion be denied.

knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request." Id., citing United States v. Malbrough, supra at 462; United States v. Hollis, 245 F.3d 671, 674 (8th Cir. 2001); United States v. Parker, 32 F.3d 395 (8th Cir. 1994).

Here, the Government has represented that it transmitted the Search Warrant via facsimile, and that the cellular provider responded by providing text messages both within and beyond the scope of the time frame requested in the Warrant. Accordingly, the cellular provider was acting pursuant to the government's request, but only so far as it related to the scope of the Warrant. May has not presented, and we have not observed, any evidence supporting a Government directive to supplement the requested text messages with additional materials. We are also presented with no evidence explaining the intent of the cellular provider in providing text messages outside the scope of the requested time frame. Accordingly, on the Record before us, we have no basis to conclude that the cellular provider was acting as a Government agent, for Fourth Amendment purposes, in providing text messages beyond the scope of the Warrant, and accordingly, we recommend that May's Motion to suppress any text messages produced outside the time frame of the Warrant be denied. See, United

States v. Smith, supra at 705 (finding that opening of package, when told by a law

enforcement official that the decision was the package handler's alone, did not make

package handler a government agent for purposes of the Fourth Amendment); United

States v. Malbrough, supra at 462 (informant directed by police to participate in

controlled buys of narcotics while trespassing on private property found to be a

private search).

In sum, we recommend that May's Motion to Suppress Evidence obtained

pursuant to the Search Warrant be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That May's Motion to Suppress Statements [Docket No. 211] be granted

in part, as more fully explained in the text of this Report and Recommendation.

2.     That Veith's Motion to Suppress Statements [Docket No. 232] be denied.

3.     That May's Motion to Suppress Evidence Obtained as Result of a Search

and Seizure [Docket No. 213] be denied.

Dated: June 12, 2006                          s/Raymond L. Erickson
                                              Raymond L. Erickson
                                              CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 29, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 29, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.